ALISON B. WILSON – Lead Counsel
KELLY M. FOLKS
SEAN HENNESSY
Attorneys for Plaintiff
COMMODITY FUTURES
TRADING COMMISSION
1155 21st Street, N.W.
Washington, D.C. 20581
Telephone: (202) 418-5000
awilson@cftc.gov
kfolks@cftc.gov
shennessy@cftc.gov

## THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | |
|---|---|
| **COMMODITY FUTURES TRADING COMMISSION,**<br><br>**Plaintiff,**<br><br>    **v.**<br><br>**PATRICK WONSEY, d/b/a ONE BELL & ASSOCIATES, INC.,**<br><br>**Defendant.** | **Civil Case No.  23-cv-2174**<br><br>**COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER EQUITABLE RELIEF UNDER THE COMMODITY EXCHANGE ACT – PERMANENT INJUNCTIVE RELIEF REQUESTED** |

Plaintiff, Commodity Futures Trading Commission ("Commission"), by and through its attorneys, alleges as follows:

## I.    SUMMARY

1.      From at least January 2017 through at least September 2022 (the "Relevant Period"), Patrick Wonsey individually and doing business as One Bell &

Associates Inc. ("OneBell") ("Wonsey" or "Defendant"), fraudulently solicited individuals ("pool participants") to trade, among other things, margined or leveraged retail foreign currency transactions ("retail forex") and binary options ("binary options" or "commodity options") on and off CFTC-regulated exchanges. In his solicitations, Defendant misrepresented his past trading success, chances of future profitablity, frequency of payouts, and the lack of risk involved with trading retail forex, digital assets or binary options through him.

2.     When pool participants gave Defendant money, Wonsey would pool the money in trading accounts that Wonsey controlled either directly, or through OneBell or his other business ventures (collectively, the "Pool").  During the Relevant Period, at least 50 pool participants sent a minimum of $3.4 million to Wonsey, of which, Defendant misappropriated at least $2.7 million of pool partcipant funds.  He used these funds to pay for personal expenses such as an apartment lease, auto loan, boat costs, diamonds, entertainment, travel, real estate and luxury goods and to make Ponzi-style payments to pool participants.

3.     Finally, not only did Defendant fraudulently solicit pool participants and misappropriate their money, Wonsey was not registered as a Commodity Pool Operator ("CPO"), did not set up the Pool as required and commingled pool participant funds with his own.

4.     By virtue of this conduct and the conduct further described herein, Defendant has engaged in acts and practices that violate Sections 2(c)(2)(C)(iii)(I)(cc), 4b(a)(2)(A) and (C), 4c(b), 4o(1)(A)-(B), and 4m(1) of the

Commodity Exchange Act ("Act"), 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6b(a)(2)(A), (C), 6c(b), 6o(1)(A)-(B), 6m(1), and Commission Regulations ("Regulations") 5.2(b)(1) and (3), 4.20(a) and (c), 5.3(a)(2)(i), 5.4, and 32.4(a) and (c), 17 C.F.R. § 5.2(b)(1), (3), 4.20(a), (c), 5.3(a)(2)(i), 5.4, 32.4 (a), (c) (2022).

5.      Unless restrained and enjoined by this Court, Defendant will likely continue to engage in acts and practices alleged in this Complaint and similar acts and practices, as described below.

6.      Accordingly, pursuant to Sections 2(c)(2)(C) and 6c of the Act, 7 U.S.C. §§ 2(c)(2)(C) and 13a-1(a), the Commission brings this action to enjoin Defendant's unlawful acts and practices, to compel compliance with the Act, and to further enjoin Defendant from engaging in any commodity-related activity.

7.      In addition, the Commission seeks civil monetary penalties, restitution, and remedial ancillary relief, including but not limited to, trading and registration bans, disgorgement, rescission, pre-judgment and post-judgment interest, and such other relief as the Court may deem necessary and appropriate.

## II.      JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1345 (providing that U.S. district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress). In addition, Section 6c(a) of the Act, 7 U.S.C. § 13a-1, provides that the U.S. district courts have jurisdiction to hear actions brought by the Commission for

injunctive relief or to enforce compliance with the Act whenever it shall appear to the Commission that a person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act, or any rule, regulation, or order thereunder. With respect to Defendant's retail forex transactions, the Commission also has jurisdiction pursuant to Sections 6c and 2(c)(2)(C)(i) of the Act, 7 U.S.C. §§ 13a-1, 2(c)(2)(C)(i).

9.      Venue properly lies with this Court pursuant to 7 U.S.C. §13a-1(e) because Defendant is found in, inhabits, or transacts business in this District, or the acts and practices in violation of the Act occurred, are occurring, or are about to occur within this District, among other places.

### III.    PARTIES

10.     **Plaintiff Commodity Futures Trading Commission** is an independent federal regulatory agency charged by Congress with the responsibility for administering and enforcing the provisions of the Act, 7 U.S.C. §§ 1–26, and the Regulations promulgated thereunder, 17 C.F.R. pts. 1–190 (2022).

11.     **Defendant Patrick Wonsey** resides in Riverview, Florida. He is doing or has done business under the name of several corporate entities that he has created over the past several years, including OneBell. Wonsey has never been registered with the Commission in any capacity.

### IV.     FACTS

**A.     Background**

12.     Wonsey incorporated OneBell as a Florida corporation effective February 7, 2017, listing himself as President and Registered Agent, and identifying OneBell's principal address as his own.  The Florida Secretary of State Division of Corporations administratively dissolved OneBell in September 2022.

13.     In February 2017, Wonsey opened a bank account at JPMorgan Chase, N.A. in OneBell's name (the "Chase account").  In January 2019, Wonsey opened up an additional bank account at Bank of America, N.A. in OneBell's name (the "BOA account," and together with the Chase account, the "Wonsey-controlled bank accounts").

14.     Wonsey maintained trading accounts in his own name at TD Ameritrade Futures & Forex, where he traded, among other things, retail forex contracts, since 2013.  He established a corporate account with TD Ameritrade for OneBell in March 2017.  In so doing, he claimed to be a 70% owner of the account, while a OneBell employee held the remaining 30%.

15.     Wonsey set up a trading account in his own name for digital asset transactions with the online platform Coinbase in January 2017.

16.     Wonsey established a trading account under his own name in January 2018 with the North American Derivatives Exchange, Inc. ("Nadex"), a Designated Contract Market regulated by the CFTC, where he traded in binary options ("on-exchange binary options").  The terms of Wonsey's membership

required, *inter alia*, that he trade only on his own behalf.  Nadex's Compliance Department found, following an investigation, that Wonsey had violated the terms of his membership by soliciting customer funds for trading at Nadex through his association with OneBell and another Wonsey-controlled entity named TradeDow LLC ("TradeDow").  As a result, Nadex revoked Wonsey's membership, terminated his account as of May 26, 2021, and permanently banned him from trading on Nadex Markets.

17.     Wonsey established a trading account in OneBell's name in February of 2017 at Interactive Brokers LLC ("Interactive Brokers"), a futures commission merchant.  He used this account to trade retail forex and binary options.  Wonsey was the 100% owner of the account at Interactive Brokers.

18.     Wonsey also set up trading accounts in his own name through the off-exchange (*i.e.* not on an exchange directly regulated by the Commission) trading platform Hugosway for the purpose of trading binary options on, primarily, retail forex and digital assets.

### B.     Defendant's Fraudulent Solicitations

19.     During the Relevant Period, while acting as an unregistered CPO, Wonsey solicited pool participants and prospective pool participants through telephone calls, emails, text messages, in-person meetings, word of mouth, and on publicly available websites connected with OneBell and Trade Dow.  Wonsey also cross-promoted his companies, advertising on the TradeDow website, "If you are looking for a fund manager to 'trade for you,' we recommend OneBell and

Associates." Wonsey told pool participants and prospective pool participants that he would trade commodity futures, retail forex, binary options and digital assets through the Pool on behalf of pool participants.

20.     To lure pool participants and prospective pool participants into giving him money, Wonsey made fraudulent misrepresentations about: 1) his profitable trading history, 2) ability to earn future returns, 3) the frequency of payouts, and, 4) his ability to limit risk for pool participants and prospective pool participants.

21.     For example, on OneBell's website, Wonsey claimed to operate a fund that started at "just $10,000," but had "generated over $1 million dollars in profits for family and friends." He further boasted about "profit margins yearly 50+".

22.     Wonsey told pool participants and prospective pool participants that he would make them into millionaires, and that they would be in the position to pay off their homes, and buy new vehicles, within a short period, such as six months.

23.     Even when he was losing money on trades, Wonsey obscured the truth from pool participants and prospective pool participants and lied about the returns he was making. He told one pool participant, "the market hasn't popped as i [sic] anticipated however we are still up over 30%," and promised "payout" a month later.

24.     When one pool participant asked Defendant to make a trade, Defendant declined, stating, "I got your funds in a mix of things at the moment. Things that are sure bets."

25.     Additionally, Wonsey falsely represented to pool participants that he would make regular "dividend" payments, typically around 10% of the pool participant's investment in the Pool, on a monthly basis to many of the pool participants.

26.     Defendant also downplayed the risks of trading.  He misrepresented to pool participants and prospective pool participants that the risks associated with his management of their funds were so low as to be "nothing" and that he had "measures in place" that would mitigate the risk of loss to the point that he could "stop" it.

27.     Defendant's representations as set out in Paragraphs 21-26, above, are false and were made intentionally or with reckless disregard of the truth.  His representations about his prior trading success, his promises of future trading gains, frequency of payouts, and his lies about being able to control losses all are belied by both his overall unsuccessful trading and his misappropriation of a substantial part of pool participant funds.

28.     Further, Wonsey failed to tell pool participants that he was running a Ponzi scheme and that he was stealing their funds to pay for his personal expenses.

29.     At least 50 pool participants deposited no less than $3.4 million into the Pool.

**C.      Fraudulent Misrepresentations in Documents Provided to Pool Participants**

30.     Based upon Defendant's misrepresentations, pool participants entered into written agreements with Wonsey to execute certain trades on their behalf.  The agreements were provided by email, or through other means or instrumentalities of interstate commerce.

31.     Many of these written agreements provided that pool participant funds would be used to trade retail forex and digital assets and include misleading statements such as, "100k projected", to entice pool participants and prospective pool participants into entering into the transactions.

32.     Once the written agreement was executed, pool participants wired their funds into a Wonsey-controlled bank account for purported trading.

33.     In addition to written agreements regarding specific trades or types of trades, Wonsey also executed promissory notes to pool participants.  In the promissory notes, Defendant falsely and fraudulently represented that he would "immediately" return pool participant funds, plus expenses and legal costs, if he defaulted in his performance in managing the Pool.

34.     The promissory notes were fraudulent on their face.  When pool participants requested the return of their funds per the terms of the promissory

notes, Wonsey did not abide by the terms of the promissory notes with respect to repayment.

35.     For example, one pool participant requested the return of the $20,000.00 in retirement savings she had wired to Wonsey; however, Wonsey stopped responding to her messages and did not return her funds.

36.     Many, if not all, pool participants were not Eligible Contract Participants ("ECP"), as defined in Section 1a(18)(A)(xi) of the Act, 7 U.S.C. §1a(18)(A)(xi).

D.     **Defendant's Trading and Misappropriation of Pool Participant Funds**

37.     Defendant received pool participant funds of at least $3.4 million. These funds were deposited in the Wonsey-controlled bank accounts and a Coinbase wallet in Wonsey's name.

38.     Of the $3.4 million, Defendant deposited only approximately $2.2 million into trading accounts in the name of OneBell at TD Ameritrade and Interactive Brokers, and in his own name at Nadex for purposes of trading retail forex and binary options on behalf of pool participants.

39.     Wonsey also opened an account at Hugosway, an off-exchange trading platform.  In order to fund this trading account, Wonsey needed to convert pool participant funds into Bitcoin.  He did this through Coinbase.  Once he bought Bitcoin, he used that to fund the Hugosway account.  He used this account to trade binary options on retail forex and digital assets.

40.     Defendant told pool participants that he would trade commodity futures, retail forex, precious metals, digital assets, and binary options, but in reality, Defendant only traded retail forex and binary options on retail forex and digital assets at Nadex, TD Ameritrade, Interactive Brokers and Hugosway.

41.     During the relevant period, Defendant lost at least $300,000 in unsuccessful trading, commissions, and fees.  The remaining $1.9 million of pool participants' funds from these trading accounts was transferred back to the Wonsey-controlled bank accounts.

42.     Rather than trade retail forex or binary options on behalf of the Pool, Defendant misappropriated pool participant funds by using new pool participant money to pay older pool participants "profits" in the manner of Ponzi payments. He also used a substantial portion of the pool participant funds for his personal benefit.

43.     Of the approximately $3.4 million in pool participant funds solicited by Defendant, Defendant misappropriated at least $700,000 and used these funds to make Ponzi-like payments to pool participants to perpetuate his fraud.

44.     The remaining approximately $2.7 million was misappropriated by Defendant.

45.     Of the approximately $2.7 million that was misappropriated, which includes the $300,000 he fraudulently solicited and lost trading, Wonsey transferred approximately $1.9 million into his personal bank accounts.  He then spent an additional $420,000 on personal expenses such as an apartment lease,

an auto loan, boat costs, diamonds, entertainment, travel, real estate and luxury goods.  Additionally, Wonsey withdrew over $340,000 in cash.

46.     In one instance on December 23, 2020, a pool participant wired $7,000 into OneBell's Chase account with "Investment" written in the reference field.  On the same day, Defendant transferred $7,000 to his personal bank account.  Analysis of the Defendant's various trading accounts show no such deposit on or around December 23, 2020.  Defendant appears to have misappropriated the entire pool participant's deposit.

47.     Similarly, on March 26, 2021, a pool participant wired $10,000 into OneBell's Chase account with "GBPUSD" written in the reference field.  GBPUSD is the common symbol used to reference the trading of the currency pair British Pound versus the U.S. dollar in retail forex markets.  On the same day, Defendant transferred $10,000 to his personal bank account.  Analysis of Defendant's various trading accounts show no such deposit on or around March 26, 2021 for the purpose of retail forex trading.  Defendant appears to have misappropriated the entire pool participant's deposit.

48.     As recently as May 2023, Wonsey has made fraudulent excuses for not returning funds to at least one pool participant.  When pressed, Wonsey alternately claimed that the funds were on hold because he was being investigated or audited, the funds were overseas and he needed time to transfer them to the United States, or that the funds were "stuck" in an investment retirement account and Wonsey needed time to secure their release.

49.     When another pool participant voiced concerns about Wonsey losing money on trades, Wonsey made the excuse that, "I have been in retrograde for the past 2 months.  But its [sic] not as bad as it seems.  I will have our funds back . . . within the next 2 months give or take.  Yes its [sic] a volatile period . . . but I need 2 months to close out the accounts not just for the investigation but for opportunities I have going in my direction."

**E.     Defendant's Operation of the Pool**

50.     Wonsey, while acting as an unregistered CPO freely moved money between the Wonsey-controlled bank accounts and various trading accounts opened in both his name and OneBell's.  In this manner, Wonsey commingled pool funds with his own money.  Further, Wonsey did not operate the Pool as a legal entity separate from himself.

**V.     VIOLATIONS OF THE COMMODITY EXCHANGE ACT**

**COUNT I**

**Violations of Section 4b(a)(2)(A) and (C) of the Act, 7 U.S.C.
§ 6b(a)(2)(A), (C), and Regulation 5.2(b)(1) and (3), 17 C.F.R.
§ 5.2(b)(1), (3) (2022)
(Retail Forex Fraud by Misappropriation, Misrepresentations and
Omission)**

51.     Paragraphs 1 through 50 are realleged and incorporated herein by reference.

52.     7 U.S.C. § 6b(a)(2)(A) and (C) makes it unlawful:

[F]or any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, [ . . . ] that is made, or to be made, for or on behalf of, or with, any other person other than on or subject to the rules of a designated contract market –

(A) to cheat or defraud or attempt to cheat or defraud the other person;

. . . .

(C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for or, in the case of paragraph (2), with the other person.

53.     Section 2(c)(2)(C)(i)(I) of the Act, 7 U.S.C. § 2(c)(2)(C)(i)(I), sets out that the Commission has jurisdiction over retail forex agreements, contracts, or transactions if certain requirements are met.  These requirements are that:  1) the customers to the retail forex agreements, contracts, or transactions not be ECPs and 2) the retail forex agreements, contracts, or transactions are offered on a leveraged or margined basis.  Both of those conditions are met in this case.

54.     Section 2(c)(2)(C)(ii)(I) of the Act, 7 U.S.C. § 2(c)(2)(C)(ii)(I), in part, makes retail forex agreements, contracts or transactions described in Section 2(c)(2)(C)(i) of the Act, 7 U.S.C. § 2(c)(2)(C)(i), "subject to" Section 4b of the Act, 7 U.S.C. § 6b, and thus 7 U.S.C. § 6b(a)(2)(A)–(C).  Additionally, Section 2(c)(2)(C)(iv) of the Act, 7 U.S.C. § 2(c)(2)(C)(iv), in part, provides that 7 U.S.C. § 6b, and thus 7 U.S.C. § 6b(a)(2)(A)–(C), also applies to the retail forex agreements, contracts, or transactions, offered by Defendants "as if" they were a contract of sale of a commodity for future delivery.

55.     17 C.F.R. § 5.2(b)(1) and (3), provides, in relevant part, that "[i]t shall be unlawful for any person, by use of the mails or by any means or

14

instrumentality of interstate commerce, directly or indirectly, in or in connection with any retail forex transaction: (1) To cheat or defraud or attempt to cheat or defraud any person . . . [or] (3) Willfully to deceive or attempt to deceive any person by any means whatsoever."

56. In connection with retail forex transaction, Wonsey, through use of the mails or any means or instrumentality of interstate commerce: (1) misappropriated pool participant funds; (2) made material misrepresentations and omissions with scienter regarding, among other things, his past trading success, future profitability, frequency of payments, and lack of risk.

57. By reason of the foregoing, Defendant violated 7 U.S.C. § 6b(a)(2)(A) and (C) and 17 C.F.R. § 5.2(b)(1) and (3).

58. Each misappropriation, misrepresentation and omission of material fact including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 6b(a)(2)(A) and (C) and 17 C.F.R. § 5.2(b)(1) and (3).

## COUNT II

## Violation of Section 4*o*(1)(A) and(B) of the Act, 7 U.S.C. § 6*o*(1)(A)-(B) (Fraud and Deceit by a Commodity Pool Operator)

59. Paragraphs 1 through 50 are realleged and incorporated herein by reference.

60.    7 U.S.C. § 6o(1) prohibits CPOs, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, from (A) employing devices, schemes or artifices to defraud any client or participant or prospective client or participant, or (B) engaging in transactions, practices, or courses of business which operate as a fraud or deceit upon any client or participant or prospective client or participant.

61.    Section 1a(11)(A)(i) of the Act, 7 U.S.C. § 1a(11)(A)(i), defines a CPO, in relevant part, as any person:

> [E]ngaged in a business that is of the nature of a commodity pool, investment trust, syndicate, or similar form of enterprise, and who, in connection therewith, solicits, accepts, or receives from others, funds, securities, or property, either directly or through capital contributions, the sale of stock or other forms of securities, or otherwise, for the purpose of trading in commodity interests, including any— . . . .
>
> (II) agreement, contract or transaction described in section [7U.S.C. §2(c)(2)(C )(i)] . . . ; or
>
> (III) any commodity option authorized under section 4c [7 U.S.C. §6c].

62.    Section 5.1(d)(1), 17 C.F.R § 5.1(d)(1) (2022), defines a CPO as:

> [F]or purposes of [17 C.F.R. pt. 5], means any person who operates or solicits funds, securities, or property for a pooled investment vehicle that is not an eligible contract participant as defined in section 1a(18) of the Act, and that engages in retail forex transactions;

63.    Pursuant to Section 2(c)(2)(C)(ii)(I) of the Act, 7 U.S.C. § 2(c)(2)(C)(ii)(I), "[a]greements, contracts or transactions" in retail forex and accounts or pooled investment vehicles in retail forex "shall be subject to . . . [7 U.S.C. § 6o]," except in circumstances not relevant here.  Additionally,

Section § 2(c)(2)(C)(vii) of the Act, 7 U.S.C. § 2(c)(2)(C)(vii), in part, provides that the CFTC has jurisdiction over an account or pooled investment vehicle that is offered for the purpose of trading foreign currency described in [7 U.S.C. §] 2(c)(2)(C)(i) of the Act.

64.     During the Relevant Period, Wonsey solicited funds, securities, or property from non-ECPs for a pooled investment vehicle for the purpose of engaging in retail forex transactions and binary options trading; therefore, Wonsey was acting as a CPO, as defined by 7 U.S.C. § 1a(11) and 17 C.F.R § 5.1(d)(1).

65.     Wonsey, through use of the mails or any means or instrumentality of interstate commerce:  (1) misappropriated pool participant funds; (2) made material misrepresentations and omissions with scienter regarding, among other things, his past trading success, future profitability, frequency of payments, and lack of risk.

66.     By reason of the foregoing, Wonsey violated 7 U.S.C. § 6*o*(1)(A)-(B).

67.     Each misappropriation and misrepresentation and omission of material fact, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 6*o*(1)(A)-(B).

## COUNT III

## Violations of Section 4c(b) of the Act, 7 U.S.C. § 6c(b), and Regulation 32.4(a) and (c), 17 C.F.R. § 32.4(a) and (c) (2022)
### (Options Fraud)

68.     The allegations in Paragraphs 1 through 50 are re-alleged and incorporated herein by reference.

69.     7 U.S.C. § 6c(b) provides "No person shall offer to enter into, enter into or confirm the execution of any transaction involving any commodity regulated under this Act which is of the character of, or is commonly known in the trade as, an "option", . . . "bid", . . . . "offer", . . . . "put" [or] "call" . . . contrary to any rule [or] regulation, of the Commission . . . prohibiting any such transaction or allowing any such transaction under such terms and conditions as the Commission shall prescribe."

70.     17 C.F.R. § 32.4(a) and (c) provides that:

> In or in connection with an offer to enter into, the entry into, or the confirmation of the execution of, any commodity option transaction, it shall be unlawful for any person directly or indirectly: a) To cheat or defraud or attempt to cheat or defraud any other person; . . . or (c) To deceive or attempt to deceive any other person by any means whatsoever.

71.     The terms "commodity option transaction" and "commodity option" are defined in Regulation 1.3, 17 C.F.R. § 1.3 (2022), to include:

> [A]ny transaction or agreement in interstate commerce which is or is held out to be of the character of, or is commonly known to the trade as, an "option," "privilege," "indemnity," "bid," "offer," "call," "put," "advance guaranty," or "decline guaranty," and which is subject to regulation under the Act and the regulations . . . .

18

72.     In connection with commodity options on retail forex and digital assets, Wonsey, through use of the mails or any means or instrumentality of interstate commerce, violated 7 U.S.C. 6c(b) and 17 C.F.R. § 32.4(a) and (c) by, among other things:  (1) misappropriating pool participant funds; (2) making material misrepresentations and omissions with scienter regarding, among other things, his past trading success, future profitability, frequency of payouts, and lack of risk.

73.     Defendant engaged in the acts and practices described above willfully or with reckless disregard for the truth.

74.     Each misappropriation, misrepresentation and omission of material fact, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. 6c(b) and 17 C.F.R. § 32.4(a) and (c).

## COUNT IV

**Violations of Sections 2(c)(2)(C)(iii)(I)(cc) and 4m(1) of the Act,
7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6m(1), and
Regulation 5.3(a)(2)(i), 17 C.F.R § 5.3(a)(2)(i) (2022)
(Failure to Register as a CPO)**

75.     The allegations in Paragraphs 1 through 50 are re-alleged and incorporated herein by reference.

76.     7 U.S.C. § 2(c)(2)(C)(iii)(I)(cc) in relevant part prohibits any person, unless registered, from operating or soliciting funds, securities, or property for any pooled investment vehicle that is not an eligible contract participant in connection with agreements, contracts, or transactions described in 7 U.S.C. § 2(c)(2)(C)(i).

77.     7 U.S.C. § 1a(11)(A)(i) defines a CPO, in relevant part, as any person:

> [E]ngaged in a business that is of the nature of a commodity pool, investment trust, syndicate, or similar form of enterprise, and who, in connection therewith, solicits, accepts, or receives from others, funds, securities, or property, either directly or through capital contributions, the sale of stock or other forms of securities, or otherwise, for the purpose of trading in commodity interests, including any— . . . .
>
> (II) agreement, contract or transaction described in section 2(c)(2)(C)(i) [7 U.S.C. §2(c)(2)(C )(i)] . . . ; or
>
> (III) any commodity option authorized under section 4c [7 U.S.C. §6c].

78.     Subject to certain exceptions and exemptions not relevant here, 7 U.S.C. § 6m(1), makes it "unlawful for any . . . [CPO], unless registered under this chapter, to make use of the mails or any means or instrumentality of interstate commerce in connection with his business as such . . . [CPO] . . .".

79.     Section 5.1(d)(1), 17 C.F.R § 5.1(d)(1) (2022), defines a CPO as:

> [F]or purposes of [17 C.F.R. pt. 5], means any person who operates or solicits funds, securities, or property for a pooled investment vehicle that is not an eligible contract participant as defined in section 1a(18) of the Act, and that engages in retail forex transactions.

80.     17 C.F.R § 5.3(a)(2)(i) requires that any person who meets the CPO definition set forth in 17 C.F.R § 5.1(d)(1) must register as a CPO.

81.     During the Relevant Period, Wonsey operated or solicited funds, securities, or property for a pooled investment vehicle from non-ECP pool participants for the purpose of retail forex transactions and binary options trading; thus, Wonsey acted as a CPO within the meaning of 7 U.S.C. § 1a(11) and 17 C.F.R § 5.1(d)(1).

82.     Wonsey violated 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc) and 6m(1) and 17 C.F.R § 5.3(a)(2)(i) by using the mails or other means or instrumentalities of interstate commerce in connection with his business as a CPO without being registered with the Commission as such.

## COUNT V

### Violation of Regulation 4.20(a)(1) and (c) and 5.4
### 17 C.F.R § 4.20(a)(1), (c), 5.4 (2022)
### (Failure to Operate Pool as Separate Entity; Commingling of Pool Funds)

83.     Paragraphs 1 through 50 are realleged and incorporated herein by reference.

84.     17 C.F.R. § 5.4 states, in part, that Part 4 of the Regulations, 17 C.F.R. pt. 4 (2022), applies to any person required to register as a CPO pursuant to Part 5 of the Regulations, 17 C.F.R. pt. 5 (2022), and that "[f]ailure by any such person to comply with the requirements of part 4 will constitute a violation of this section and the relevant section of part 4."

85.     17 C.F.R. § 4.20(a)(1) requires a CPO, whether registered or not, to operate its pool as a legal entity separate from that of the CPO.

86.     17 C.F.R. § 4.20(c) prohibits a CPO, whether registered or not, from commingling the property of any pool it operates with the property of any other person.

87.     Defendant, while acting as a CPO, failed to operate the Pool as a legal entity separate from himself or OneBell.  Additionally, Defendant routinely

commingled pool participant funds with his own personal funds and funds belonging to others.

88.    By reason of the foregoing, Defendant violated 17 C.F.R. §§ 4.20(a)(1) and (c) and 5.4.

89.    Each act of failing to operate a commodity pool as a legal entity separate from that of the CPO, and commingling the property of the pool with non-pool property, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of 17 C.F.R. §§ 4.20(a)(1) and (c) and 5.4.

## VI.    **RELIEF REQUESTED**

WHEREFORE, the Commission respectfully requests that this Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1, and pursuant to its own equitable powers:

A.    Find that Defendant violated Sections 2(c)(2)(C)(iii)(I)(cc), 4b(a)(2)(A) and (C), 4c(b), 4o(1)(A)–(B), and 4m(1), 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6b(a)(2)(A), (C), 6c(b), 6o(1)(A)–(B), 6m(1), and Regulations 4.20(a)(1) and (c), 5.2(b)(1) and (3), 5.3(a)(2)(i), 5.4, and 32.4(a) and (c), 17 C.F.R. §§ 4.20(a)(1), (c), 5.2(b)(1), (3), 5.3(a)(2)(i), 5.4, 32.4(a), (c) (2022);

B.    Enter an order of permanent injunction permanently restraining, enjoining, and prohibiting Defendant, and any other person or entity associated with him, from engaging in conduct described above, in violation of 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6b(a)(2)(A) and (C), 6c(b), and 6o(1)(A)–(B), and 17 C.F.R. §§ 4.20(a)(1) and (c), 5.2(b)(1) and (3), 5.3(a)(2)(i), 5.4, and 32.4(a) and (c);

C.    Enter an order of permanent injunction permanently restraining,

enjoining, and prohibiting Defendant, and any other person or entity associated with them, from directly or indirectly:

1) Trading on or subject to the rules of any registered entity (as that term is defined by Section 1a(40) of the Act, 7 U.S.C. § 1a(40));

2) Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3, 17 C.F.R. § 1.3 (2022)), for accounts held in the name of Defendant or for accounts in which Defendant has a direct or indirect interest;

3) Having any commodity interests traded on any Defendant's behalf;

4) Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

5) Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling of any commodity interests;

6) Applying for registration or claiming exemption from registration with the CFTC in any capacity, and engaging in any activity requiring such registration or exemption from registration with the CFTC except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2022); and

7) Acting as a principal (as that term is defined in Regulation 3.1, 17 C.F.R. § 3.1(a) (2022)), agent, or any other officer or employee of any person registered, exempted from registration, or required to be registered with the CFTC except as provided for in 17 C.F.R. § 4.14(a)(9).

D. Enter an order directing Defendant, as well as any third-party transferee and/or successors thereof, to disgorge, pursuant to such procedure as the Court may order, all benefits received including, but not limited to, salaries,

commissions, loans, fees, revenues, and trading profits derived, directly or indirectly, from acts or practices which constitute violations of the Act and Regulations as described herein, including pre-judgment and post-judgment interest;

  E. Enter an order requiring Defendant as well as any successors thereof, to make full restitution to every person who has sustained losses proximately caused by the violations described herein, including pre-judgment and post-judgment interest;

  F. Enter an order directing Defendant, as well as any successors thereof, to rescind, pursuant to such procedures as the Court may order, all contracts and agreements, whether implied or express, entered into between, with or among Defendant and any of the pool participants whose funds were received by Defendant as a result of the acts and practices that constituted violations of the Act and Regulations as described herein;

  G. Enter an order directing Defendant to pay a civil monetary penalty assessed by the Court, in an amount not to exceed the penalty prescribed by Section 6c(d)(1) of the Act, 7 U.S.C. § 13a-1(d)(1), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114–74, tit. VII, § 701, 129 Stat. 584, 599–600, *see* Regulation 143.8, 17 C.F.R. § 143.8 (2022), for each violation of the Act and Regulations, as described herein;

  H. Enter an order requiring Defendant to pay costs and fees as permitted by 28 U.S.C. §§ 1920, 2413(a)(2); and

  I. Enter an order providing such other and further relief as this Court may deem necessary and appropriate under the circumstances.

Dated:  September 26, 2023      Respectfully submitted,

COMMODITY FUTURES
TRADING COMMISSION

  /s/ Alison B. Wilson
ALISON B. WILSON – Lead Counsel
KELLY M. FOLKS
SEAN HENNESSY
Attorneys for Plaintiff
COMMODITY FUTURES
TRADING COMMISSION
1155 21st Street, N.W.
Washington, D.C. 20581
Telephone: (202) 418-5000
awilson@cftc.gov
kfolks@cftc.gov
shennessy@cftc.gov